

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| NICHOLAS WEBB & <br> THAD BEVERSDORF, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | 2015L006104 <br> CALENDAR/ROOM Y <br> TIME 00:00 <br> Fraud |
| v. | ) <br> ) | No.: |
| MICHAEL FRAWLEY, | ) <br> ) | |
| Defendant. | ) <br> ) | |
| v. | ) <br> ) | |
| JEFFERIES LLC, | ) <br> ) | |
| Respondent in Discovery. | ) | |

FILED B-15 2015 JUN 16 PM 3:11 DOROTHY BROWN CLERK OF THE CIRCUIT COURT OF COOK COUNTY, IL

## COMPLAINT

NOW COME the Plaintiffs, Nick Webb and Thad Beversdorf, by and through their attorneys, McKnight, Kitzinger, & Pravdic, LLC, and complaining of Defendant and pleading in the alternative, state as follows:

I. The Parties

1. Plaintiff, Thad Beversdorf, ("Beversdorf") is a resident of Chicago, Illinois and has been employed in the securities industry at all relevant times. Beversdorf has expertise in base, ferrous and precious metals trading.

2. Plaintiff, Nicholas Webb, ("Webb") is a resident of Chicago, Illinois and has been employed in the securities industry at all relevant times. Webb has expertise in base, ferrous and precious metals trading.

3. Defendant, Michael Frawley, ("Frawley") is a resident of Montauk, New York and has been employed in the securities industry at all relevant times. Frawley has expertise in base, ferrous and precious metals trading.

4. The respondent in discovery, Jefferies LLC, ("Jefferies") is a Delaware limited liability company headquartered at 520 Madison Avenue, New York, New York. Jefferies is an independent securities and investment banking firm and a successor to Jefferies & Company, Inc., and Jefferies Bache, LLC. Jefferies area of focus globally includes aerospace and defense, banks, business services, chemicals, clean technology, consumer, energy, gaming, general industrials, healthcare, maritime, media, mining and metals, real estate, retailing, specialty finance, technology, and telecommunications. Jefferies provides brokerage and clearing services in listed derivatives.

II.     **The Relationships.**

5. In 2001, Beversdorf was hired by Carr Futures, which became Calyon Financial, Inc., which then merged with Newedge USA, LLC on January 1, 2008.

6. On May 3, 2011, Newedge hired Webb, a resident of Chicago, Illinois, as a sales executive for Newedge's Global Metals Group.

2

7. Webb reported directly to co-claimant Beversdorf. Beversdorf and Webb had frequently worked together to consummate transactions and Beversdorf frequently mentored Webb.

8. Beversdorf was a director for Newedge's Global Metals Group.

9. At Newedge, Beversdorf reported directly to Frawley, the Global Head of the Metals Group at Newedge.

10. Frawley reported directly to the Chief Executive Officer of the Newedge Group, Patrice Blanc.

11. In 2010, Jefferies began to implement a plan to enter the commodities future marketplace in over-the-counter trading of base, ferrous and precious metals.

12. In April of 2011, Jefferies entered into a definitive agreement to acquire Prudential Bache's Global Commodities Group from Prudential Financial, Inc.

13. At the time of its acquisition, Prudential Bache Commodities, LLC offered brokerage and clearing services in listed derivatives on all major futures and options exchanges around the world, and offered over-the-counter trading in foreign exchange, base, ferrous and precious metals, and energy agricultural swap transactions.

14. Prudential Bache Commodities, LLC was renamed Jefferies Bache.

15. In April of 2011, Richard Handler, Chief Executive Officer for Jefferies, announced its acquisition of Prudential Bache Commodities and its intention to

"rapidly and cost effectively accelerate [its] growth in futures and expand [its] presence in commodities."

16.     In order to implement this plan, in October of 2011, Jefferies hired the former CEO of Newedge Group, Patrice Blanc as the Chief Executive Officer for Jefferies Bache, LLC.

17.     In February or March of 2012, Patrice Blanc approached Frawley to discuss Jefferies acquiring the account executives, professionals and support staff of Newedge's profitable Global Metals Group to help implement Jefferies' acceleration into the metals market.

18.     Frawley promised to Blanc that he could propel Jefferies into a market leading Category 1 member of the London Metals Exchange, as he had done at Newedge. Frawley also advised that members of his team from Newedge would follow him to Jefferies.

19.     Shortly thereafter, Jefferies also announced its intention of "recruiting a full team of sales executives and operations professionals."

20.     Among the sales executives recruited by Frawley for Jefferies were the Plaintiffs, Beversdorf and Webb.

II.     **Recruitment of Thad Beversdorf and Nicholas Webb**

21.     Frawley in turn approached Beversdorf beginning in late March or early April of 2012.

4

22.     Frawley informed Beversdorf that Jefferies was planning on greatly expanding its metal franchise at a time when increased regulatory costs were causing other companies to restrict such activities.

23.     Frawley inquired as to whether Beversdorf would want Nicholas Webb to come over to Jefferies with him; and Beversdorf replied that he would want Nicholas Webb.

24.     At the same time that Frawley was having discussions with Beversdorf and Webb, Frawley was also having similar discussions with other senior people in the Newedge Metals Group.

25.     On or about June 4, 2012, Frawley resigned from Newedge and became the Vice Chairman and Global Head of Metals and Listed Products for Jefferies.

26.     On or about June 4, 2012, Nicholas Webb resigned from Newedge and entered into an employment contract with Jefferies in its Chicago office.

27.     On or about June 4, 2012, Thad Beversdorf resigned from Newedge and entered into an employment contract with Jefferies in its Chicago office.

III.    **Interference leading to Termination**

28.     In 2012, Jefferies was marketing itself as an expert in commodities trading with a particular expertise in metals.

29.     After recruiting numerous individuals from Newedge, Jefferies' management, beginning in July 2012 and subsequent to being notified of a legal claim

5

by Mike's former employer Newedge against Jefferies seeking damages for 'poaching' employees, enforced an internal policy requiring that all metals trades generated by former Newedge employees be executed through Jefferies' London metals desk resulting in the inability to tie profitability back to former Newedge employees.

30. Beginning in July 2012 Jefferies also adopted an internal policy and internal accounting procedures to attribute numerous categories of expenses to the metals trading business units or desks. These expenses were not fiscally attributable to or incurred by the metals trading business units or desks.

31. Jefferies' internal trading and accounting procedures resulted in the metals trading business units or desks, brought in by Frawley, to appear unprofitable without detrimentally impacting the overall performance of Jefferies.

32. Frawley disagreed with Jefferies internal trading and accounting procedures and publically stated his disagreement with these decisions. Frawley disagreed with these policies and procedures because it made his business units appear less profitable or not profitable. This in turn negatively impacted Frawley's individual success within Jefferies and commercial reputation.

33. In addition, Frawley knew that after Jefferies adopted these policies and procedures, he would have difficulty in retaining qualified personnel in his business units because former Newedge personnel would leave as a result of being denied bonuses and compensation as a direct result of the enforced subject policies.

6

34. Frawley also opposed these internal policies and procedures because his business units would appear to be underperforming compared to other Jefferies business units.

35. Upon information and belief, the adoption of these policies would cause a reduction in Frawley's compensation and potentially could cost him his job. In addition, Frawley was concerned about his ability to obtain post-Jefferies employment.

36. With the aforementioned policies in place, from July 2012 to May 2013 Frawley was, on paper, unable to deliver the type of performance he had promised. Upon information and belief, Frawley's job and/or his compensation was threatened. In addition, Frawley was concerned about his ability to obtain post-Jefferies employment.

37. As early as May 2013, Jefferies concluded in an Executive Committee meeting that Jefferies would no longer pursue iron ore business. Jefferies instructed Frawley to direct his direct reports not to pursue or book trades in iron ore. Jefferies did not inform Beversdorf or Webb of its decision. Beversdorf and Webb were never aware of Jeffferies decision, as it was incumbent upon Frawley to inform Beversdorf and Webb.

38. Frawley was desperate to save his commercial reputation and needed to establish a book of business that did not trade through Jefferies' London metals unit. Upon information and belief, Frawley believed he had to develop this business to save his job, compensation and commercial reputation.

7

39. The only way Frawley could save his own commercial reputation and upon information and belief save his job and compensation was to develop a series of lucrative trades in the iron ore business and attribute these trades and transactions to his efforts.

40. Jefferies could not effectively trade iron ore from its London metals desk, so Frawley knew that trading iron ore would directly contravene Jefferies' internal trading and accounting policies. Frawley also knew that these trades could only be attributable to his former Newedge staff business units.

41. To fulfill this goal, Frawley in direct contravention of the above described internal policies and directives, directed Beversdorf and Webb to pursue iron ore business after May 2013.

42. On May 31, 2013, Frawley sent an e-mail to various employees of Jefferies indicating that Webb and Beversdorf would facilitate bringing the Jefferies Metals Desk into the iron ore market.

43. On May 31, 2013, Webb and Beversdorf were told by Frawley that they would be facilitating Iron Ore across the Metals Desk globally.

44. Despite this representation, Jefferies Executive Committee had already decided to cancel iron ore as a product at Jefferies. Webb and Beversdorf could have pursued other transactions that would have been both profitable to themselves and to Jefferies.

8

45. At the direction of Frawley, over the next several months, Beversdorf and Webb devoted hundreds of hours to strategize building the iron ore desk in Chicago, even though that product had already been cancelled.

46. During those months, Webb and Beversdorf had numerous conversations with Frawley concerning the iron ore desk, and received instructions from Frawley that Jefferies intended to continue its plan to bring Jefferies into the iron ore market.

47. On August 8, 2013, Frawley informed Beversdorf and Webb's that their position at Jefferies was in peril because of a lack of profitability causing layoffs within the company.

48. On August 28, 2013, Frawley contacted Beversdorf on Beversdorf's personal phone and informed him that Beversdorf and Webb were being fired; that the termination was being processed by Jefferies' Human Resources and Legal departments; to seek new employment; but that one way they could save their jobs would be to book a few large iron ore deals.

49. Beversdorf informed Frawley that he and Webb had a number of pending highly profitable iron ore deals and sent Frawley a detailed update on the pending iron ore trades.

50. The next day, August 29, 2013, Beversdorf sent Frawley a request to approve the iron ore electronic trading limits for one a pending iron ore trade with a

9

client that Beversdorf and Webb developed in the previous months. Frawley approved the trading limits.

51. Frawley directed Beversdorf and Webb and approved the transactions in direct contravention of Jefferies directives and Frawley did so to serve his own interests and not the interests of Jefferies, Beversdorf or Webb.

52. Frawley was not acting on behalf of Jefferies. Frawley's conduct in directing Beversdorf and Webb did not arise out of or relate to Jefferies business because it had concluded that it was not in the iron ore business. Frawley's directions to Beversdorf and Webb were outside the scope of Frawley's duties and responsibilities with Jefferies. Unbeknownst to Beversdorf and Webb, the pursuit of iron ore trades and transactions was outside the scope of their employment.

53. On August 30, 2013, Yvonne Downs, the COO of Jefferies informed Beversdorf and Webb that iron ore had been formally cancelled as a product back in May at a meeting attended by Frawley.

54. On that same day, Frawley told Beversdorf that he and Webb had until mid-September before being terminated at Jefferies; and that Beversdorf should hire an attorney, sign a release and settle with Jefferies.

55. On September 3, 2013, Beversdorf asked Frawley to assist in getting approval for the iron ore deals.

56. Later that day, Yvonne Downs e-mailed Beversdorf informing him that the management at Jefferies refused to consider the iron ore deal, and that iron ore would remain a product not marketed by Jefferies.

57. Beversdorf and Webb went to Human Resources to ascertain what the truth was about their employment statuses.

58. Human Resources refused to comment and would not give a timeframe for a response.

59. On September 6, 2013, Beversdorf and Webb began calling all of their prospective iron ore clients, to inform them that Jefferies would not be participating in iron ore products. This directly resulted in their commercial reputations being irreparably damaged in the industry.

60. On September 11, 2013, Beversdorf and Webb told Frawley that they had informed the prospective clients of Jefferies decision not to participate in iron ore products.

61. On October 21, 2013, Beversdorf and Webb were terminated without explanation.

62. Beversdorf and Webb were later advised that Jefferies fired them for poor performance and a lack of production.

63. Frawley used Beversdorf and Webb in an attempt to resurrect or save his commercial reputation and upon information and belief preserve his compensation.

11

Frawley did this despite being specifically directed by Jefferies, before his instructing Beversdorf and Webb, that Jefferies would not be trading or accepting transactions related to iron ore.

64. Beversdorf and Webb relied upon Frawley's representations to their detriment by working on developing trades that Jefferies would not fulfill and that Frawley knew that Jefferies would not fulfill.

### Count I – Tortious Interference With Contract (Webb)

65. Webb had an existing valid and enforceable contract with Jefferies.

66. Frawley knew of the existence of Webb's contract.

67. Frawley intentionally induced the contract's breach, by ordering Webb to pursue business that Jefferies refused to fulfill and reporting to Jefferies that Webb was not performing.

68. Frawley had no justification to interfere in the contract between Webb and Jefferies in this fashion.

69. Webb was damaged by Frawley arising from his interference resulting in the loss of his employment, business reputation and commissions.

WHEREFORE, the Plaintiff, Nicholas Webb, respectfully prays that this Honorable Court enter judgment in his favor in an amount in excess of $50,000.00, costs of the lawsuit and for such other relief this Court deems proper and fit.

### Count II – Tortious Interference With Contract (Beversdorf)

1.-64.  Plaintiff, Thad Beversdorf repeats and re-alleges allegations 1 through 64 as if fully set forth herein.

65. Beversdorf had an existing valid and enforceable contract with Jefferies.

66. Frawley knew of the existence of Beversdorf's contract.

67. Frawley intentionally induced the contract's breach, by ordering and encouraging Beversdorf to pursue business that Jefferies refused to fulfill and reporting to Jefferies that Webb was not performing.

68. Frawley had no justification to interfere in the contract between Beversdorf and Jefferies in this fashion.

69. Beversdorf was damaged by Frawley arising from his interference resulting in the loss of his employment, business reputation and commissions.

WHEREFORE, the Plaintiff, Thad Beversdorf, respectfully prays that this Honorable Court enter judgment in his favor in an amount in excess of $50,000.00, costs of the lawsuit and for such other relief this Court deems proper and fit.

### Count III – Fraud (Webb)

1.-64.  Plaintiff, Nicholas Webb repeats and re-alleges allegations 1 through 64 as if fully set forth herein.

65. Frawley represented to Webb that Jefferies wanted him to seek iron ore trades.

66. Jefferies would not fulfill iron ore trades when Frawley told Webb to pursue iron ore transactions.

67. Webb's attempts to obtain iron ore trades were important to his job and would impact on how Webb was deemed to be performing.

68. Frawley knew that Jefferies would not fulfill iron ore trades and knew that his representations to Webb were false.

69. Frawley intended Webb to rely and act upon his representations so as to preserve his compensation and possibly his job.

70. Webb was unaware that Jefferies would not pursue or fulfill iron ore trades.

71. Webb relied upon Frawley's representations based upon his title and pursued iron ore trades that would never be fulfilled.

72. Webb was injured because he could have pursued other transactions that were profitable to Jefferies and that would have earned him commissions and made him a higher rated employee avoiding his termination and preserving his reputation in the industry.

73. Frawley continues to disparage Webb to his current employer and customers arising out of his employment with and termination from Jefferies.

14

WHEREFORE, the Plaintiff, Nicholas Webb, respectfully prays that this Honorable Court enter judgment in his favor in an amount in excess of $50,000.00, attorneys' fees costs of the lawsuit and for such other relief this Court deems proper and fit.

### Count IV – Fraud (Beversdorf)

1.-64. Plaintiff, Thad Beversdorf, repeats and re-alleges allegations 1 through 64 as if fully set forth herein.

65. Frawley represented to Beversdorf that Jefferies wanted him to seek iron ore trades.

66. Jefferies would not fulfill iron ore trades when Frawley told Beversdorf to pursue iron ore transactions.

68. Beversdorf's attempts to obtain iron ore trades were important to his job and would impact on how Beversdorf was deemed to be performing.

69. Frawley knew that Jefferies would not fulfill iron ore trades and knew that his representations to Beversdorf were false.

70. Frawley intended Beversdorf to rely and act upon his representations so as to preserve his compensation and possibly his job.

71. Beversdorf was unaware that Jefferies would not pursue or fulfill iron ore trades.

15

72. Beversdorf relied upon Frawley's representations based upon his title and pursued iron ore trades that would never be fulfilled.

73. Beversdorf was injured because he could have pursued other transactions that were profitable to Jefferies and that would have earned him commissions and made him a higher rated employee avoiding his termination and preserving his reputation in the industry.

WHEREFORE, the Plaintiff, Thad Beversdorf, respectfully prays that this Honorable Court enter judgment in his favor in an amount in excess of $50,000.00, attorneys' fees, costs of the lawsuit and for such other relief this Court deems proper and fit.

### Count IV – Respondent in Discovery (Jefferies)

1.-64. Plaintiffs, Thad Beversdorf and Nicholas Webb, repeat and re-allege allegations 1 through 64 as if fully set forth herein.

65. Plaintiffs, Thad Beversdorf and Nicholas Webb designate Jefferies, LLC as a respondent in discovery.

66. Plaintiffs, Thad Beversdorf and Nicholas Webb believe Jefferies has information essential to the determination of who should properly be named as additional defendants in the action.

67. Plaintiffs, Thad Beversdorf and Nicholas Webb believe Jefferies has information regarding other individuals who may be complicit with Frawley in the fraud and torts committed upon Webb and Beversdorf.

Respectfully Submitted,

Thad Beversdorf and Nicholas Webb,

_____
By One of Their Attorneys

Cornelius E. McKnight
Nathan P. Karlsgodt
McKnight, Kitzinger & Pravdic, LLC
117 North Jefferson Street, Suite 301
Chicago, Illinois 60661
312-463-9400 (T)
*nmcknight@mkplawyers.com*

17

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies (1) that he is authorized to sign this document and (2) that the statements set forth in this instrument are true and correct, except as to matters stated therein to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Nicholas Webb

SUBSCRIBED and SWORN to
before me this 16th day of June, 2015.

_____
Notary Public

OFFICIAL SEAL
ALLISON S. MILLINER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-19-2017

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies (1) that he is authorized to sign this document and (2) that the statements set forth in this instrument are true and correct, except as to matters stated therein to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Thad Beversdorf

SUBSCRIBED and SWORN to
before me this 16th day of JUNE, 2015.

_____
Notary Public

> OFFICIAL SEAL
> MICHELE LIBBY
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:06/05/16