IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Nicholas Webb                        )
                                     )
        Plaintiff,                   )
                                     )
                                     )
    v.                               ) Case No. 15 C 6406
                                     )
                                     )
Michael Frawley.                     )
                                     )
        Defendant.                   )
                                     )


<u>MEMORANDUM OPINION ORDER</u>


In this action, whose litigation costs at this juncture must

vastly exceed the damages originally asserted,[1] Nicholas Webb, a

securities trader fired from his job at the financial services

---

[1] Webb and his erstwhile co-plaintiff, Thad Beversdorf, originally
filed this action in the Circuit Court of Cook County. After
defendant removed to this court, plaintiffs moved to remand on the
ground that the amount in controversy did not exceed $75,000.
Judge Der-Yeghiayan denied that motion, and he also granted the
defendant's motion to compel arbitration. Plaintiffs appealed. *See*
*Webb v. Frawley*, 858 F.3d 459 (7th Cir. 2017). The Seventh Circuit
affirmed the denial of remand and affirmed the order compelling
arbitration in part, requiring Beversdorf to arbitrate his claims,
but remanding Webb's claims to this court. *Id.* at 461-62. I note
that the employment dispute at the heart of this case also spawned
a related action, *Webb v. Financial Industry Regulatory Authority,*
*Inc.*, 16 C 4664 (N.D. Ill.), in which Webb and Beversdorf allege
that FINRA mishandled claims they submitted for arbitration and
later withdrew. That action was likewise removed to federal court,
where Judge Wood dismissed it at the pleading stage in a decision
Webb and Beversdorf have appealed. *See id.*, 2017 WL 2868996 (N.D.
Ill. July 5, 2017) (Wood, J.), notice of appeal filed July 26,
2017). This is, by any measure, a lot of litigation arising out of
events that plaintiff originally indicated caused him no more than
$75,000 in damages.

firm Jeffries, LLC, sues his former supervisor, Michael Frawley. Webb claims that Frawley encouraged him to spend hundreds of hours pursuing trades in iron ore, even though Frawley knew—but hid from Webb—that Jeffries had decided to "cancel iron ore as a product" and would not approve the trades. Webb asserts claims for tortious interference with contract and for common law fraud. Before me is Frawley's motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), which I grant for the following reasons.

The basic pleading standards of Rule 8 are not demanding. A plaintiff must plead enough facts to "present a story that holds together," and that, if true, entitle him to relief. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Webb's complaint does not cross this modest threshold. Defendants raise a number of specific arguments for dismissal, several of which I address briefly, but their overarching argument—that plaintiff's claim is inherently implausible, i.e., that it does not "hold together"—is compelling.

The basic story that emerges from plaintiff's complaint is that in late 2011, Jeffries sought to enter the metals trading market and recruited Frawley—a trader with expertise in metals trading, who then worked for another firm called Newedge—for this purpose. Frawley, in turn, recruited other metals traders from Newedge, including Webb, who resigned from Newedge and began working in Jeffries's Chicago office in June of 2012, under

Frawley's supervision. Shortly thereafter, however, allegedly in response to a legal action in which Newedge claimed that Jeffries had "poached" its employees, Jeffries implemented a policy requiring that all of the metals trades generated by Webb and others formerly at Newedge be executed through Jeffries's London desk. (Webb and his colleagues were located in Jeffries's Chicago office.) In addition, Jeffries adopted a policy of allocating expenses to the metals trading business unit that were not fiscally attributable to that unit. Webb claims that Frawley was unhappy with these policies because they made his business unit appear unprofitable and compromised the ability of the employees in the unit—including Frawley himself—to earn commissions and bonuses. This jeopardized Frawley's ability to retain qualified traders in his unit. In addition, Frawley allegedly feared that these policies—which remained in place from July 2012 until May 2013—would have a negative effect on his compensation, his commercial reputation, and his ability to obtain employment elsewhere.

Jeffries's management allegedly decided in May 2013 to "cancel iron ore as a product at Jeffries" and directed Frawley to tell the traders in his unit to stop pursuing iron ore business. Frawley ignored that directive, Webb claims, and instead encouraged Webb to continue pursuing iron ore trades. In fact, after telling Webb in August of 2013 that his job was "in peril,"

Frawley suggested that Webb could save his job by booking a few large iron ore deals. Webb allegedly complied, and the next day he sent Frawley a request to approve a pending iron ore trade with a client he had developed in the preceding months.[2] Frawley approved the trade, but Webb later learned that Jeffries's management "refused to consider the iron ore deal" because unbeknownst to Webb, "iron ore had been formally cancelled as a product" as of the previous May. Webb then had to call all of his prospective iron ore clients to tell them that Jeffries would not engage in iron ore transactions, which he claims irreparably damaged his commercial reputation. Webb was terminated without explanation on October 21, 2013. He was later advised that the termination was for poor performance and lack of production.

Setting aside for a moment whether Webb's allegations, taken as true, add up to liability on the theories Webb asserts, the conduct Webb attributes to Frawley is hard to fathom. Webb insists that Frawley knew Jeffries would not consummate the iron ore trades he directed Webb to pursue, yet nothing in the complaint suggests any rational explanation for why Frawley would send an employee who reports to him on a fruitless mission. Webb's only response is that Frawley was "not acting on behalf of Jeffries"

_____

[2] The complaint, which has not been amended since Beversdorf was terminated as a plaintiff, actually alleges that Beversdorf sent Frawley the approval request, which related to a client that Beversdorf and Webb had developed. I note this detail for precision, but it is not material to my analysis.

4

but was "serving his own interests," thinking about his post-Jeffries employment options and reputation in the industry, but that is no response at all. The question remains: what could Frawley possibly gain in the eyes of industry professionals or a potential employer from cultivating the failure of his direct report? If Webb has some theory for why Frawley's reputation and job prospects were *inversely* related to the success of the traders in the business unit he led, nothing in the complaint or in his response brief hints at it.

Even if I assume, however, that it somehow behooved Frawley to sabotage Webb's performance, the facts Webb alleges do not support his claims. As Frawley observes, Webb's claim is premised on conduct Frawley directed at Webb himself, namely, encouraging him to pursue trades he knew their mutual employer would not approve. "Under Illinois law, liability for tortious interference [of contract] may only be premised on acts immediately directed at a third party which cause that party to breach its contract with the plaintiff." *George A. Fuller Co., a Div. of Northrop Corp. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1331 (7th Cir. 1983) (conduct directed at the plaintiff does not support claim for tortious interference) (citing *Mitchell v. Weiger*, 409 N.E. 38, 41 (Ill. App. Ct. 1980)). Webb responds that in *Frierson v. Univ. of Chicago*, 2015 WL 7771030, at *3 (Ill. App. Ct. Dec. 2, 2015), the Illinois Appellate Court recognized an exception to

this rule that applies "where a corporate officer interferes with an employee's employment with the corporation." But this citation does not advance Webb's cause because the court in *Frierson dismissed* the plaintiff's tortious interference claim on the ground that nothing in her complaint suggested that the supervisor who allegedly interfered with her contract benefitted from her termination. *Id*. Webb's complaint suffers from precisely that infirmity.

Another major flaw in Webb's contractual interference theory relates to Frawley's putative intent. All agree that tortious interference with contract requires that the defendant intend to induce a contractual breach. *See Strosberg v. Brauvin Realty Serv., Inc.*, 691 N.E. 2d. 834, 845 (Ill. App. Ct. 1998). Webb's theory appears to be that Frawley intended for Webb to be fired for defying the decision of Jeffries's management to stop pursuing iron ore trades and for wasting time on trades that would go nowhere instead of pursuing potentially fruitful transactions. But this theory cannot be reconciled with Webb's allegations that Frawley was "desperate to save his commercial reputation" and that "[t]he only way" to do so was "to develop a series of lucrative trades in the iron ore business and attribute these trades and transactions to his efforts." The only reasonable way to construe these allegations is that Frawley intended Webb's iron ore trades to *succeed*, not to fail and bring about his termination. For this

reason, too, Webb's tortious interference with contract claim
falters at the gate.

Webb's fraud claim is fatally flawed for similar reasons. To
begin, the claim is governed by Rule 9(b), which of course
requires the particulars of the alleged fraud to be pled with
specificity. *See DiLeo v. Ernst & Young*, 910 F.2d 624, 627 (7th
Cir. 1990). The fraud Webb asserts is that "Frawley represented to
Webb that Jeffries wanted him to seek iron ore trades," knowing
that was not true. But the only allegation attributing specific
representations to Frawley asserts that "[o]n May 31, 2013, Webb
and Beversdorf were told by Frawley that they would be
facilitating Iron Ore across the Metals Desk globally." Compl. at
¶ 43. The complaint also references an e-mail Frawley allegedly
sent on the same date "to various employees of Jeffries indicating
that Webb and Beversdorf would facilitate bringing the Jeffries
Metals Desk into the iron ore market." *Id*. at ¶ 42. Webb does not
identify any specific statement Frawley allegedly made, but even
reading between the lines of his allegations to infer an implicit
misrepresentation about what Jeffries "wanted," it is impossible,
for the reasons discussed above, to piece them together into a
theory of fraud that makes sense. *See Borsellino v. Goldman Sachs
Group, Inc*., 477 F.3d 502, 508 (7th Cir. 2007) (complaint failed
to "describe any sort of plausible 'what' of the fraud" where the
alleged scheme made "neither economic nor common sense.") If

Frawley intended Webb to rely on Frawley's tacit indication that Jeffries would support iron ore trades to bring about Webb's termination (as Webb's tortious interference claim asserts), Frawley's own, allegedly tenuous situation at Jeffries could only worsen as a result of Webb's reliance. Webb tries to shift the focus away from Frawley's standing at Jeffries and towards the industry as a whole, but that does not change the analysis, since Webb does not explain how or why Frawley's professional reputation would be improved or salvaged by Webb's pursuit of futile business.

For the foregoing reasons, Frawley's motion to dismiss is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: February 23, 2018